75

(C.D. 4256)

F. W. MYERS & COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 19, 1971)

*Barnes, Richardson & Colburn* (*James S. O'Kelly* and *Joseph Schwartz* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Velta A. Melnbrencis* and *Patrick D. Gill,* trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

RICHARDSON, Judge: The merchandise involved in these six consolidated protests consists of crawler tractors described as J–5, or Muskeg M. They were assessed with duty under item 692.35 of the Tariff Schedules of the United States, as "other tractors" at the rate of 11½ per centum ad valorem.

The plaintiff claims that the J–5, and Muskeg tractors are properly classifiable duty free under item 692.30 as "tractors suitable for agricultural use."

In an earlier case, *F. W. Myers & Company, Inc.* v. *United States,* 59 Cust. Ct. 445, C.D. 3182 (1967), the court held such tractors to be "suitable for agricultural use" and thus free of duty under item 692.30. The defendant did not appeal the decision. The Bureau accepted the decision with respect to the J-5 tractors, but on June 18, 1968, the Commissioner of Customs published a limiting notice in the Federal Register, wherein he stated that the government disagreed with the decision of the court with respect to the Muskeg tractors.

The lead protest before the court, protest 66/11087, covers two entries of "Bombardier J-5 tractors, model J-63," only, and the parties stipulated that these J-5 tractors are, in fact, "suitable for agricultural use." This stipulation gives plaintiff the relief it was seeking in its protest against the classification of the J-5 tractors under item 692.35.

The earlier *F. W. Myers & Company, Inc.* case, C.D. 3182, was by stipulation of the parties incorporated in this case, with one objection by the defendant to the admissibility into evidence of exhibit 3 in C.D. 3182 (R. 10). Exhibit 3 consists of four photographs (9, 10, 11, and 12) of a Muskeg tractor being used to spread fertilizer, according to the testimony of Rudy Goodall, a dairy farmer in Derby Line, Vermont, with fifteen years experience with tractors. As Mr. Goodall was not present to see the tractor in operation when the pictures were taken, and had not seen the particular tractor in the pictures, the defendant objected to the admission into evidence of exhibit 3 in the earlier case. Since Mr. Goodall used a J-5 type tractor and had seen a neighbor using such a tractor for spreading manure and lime, the court overruled the objection. We see no reason to disturb that ruling.

Mr. Goodall also testified that he had seen the tractors being used in sugaring operations, seeding operations, and logging operations on farms in Newport Center, Island Pond, and South Troy, Vermont.

Mr. Goodall introduced into evidence exhibit 4 consisting of six photographs (13 through 19), of work being done on his farm with his J-5 tractor. He appeared in all of the photographs except No. 19.

Two type tractors, the J-5 and Muskeg M, were involved in the earlier *Myers & Company* case, C.D. 3182, and the court held that both were suitable for agricultural use. In this case, in view of the stipulation of the parties that J-5 tractors are suitable for agricultural use, we are only concerned with the Muskeg M tractor and carrier, but the issue is the same as in the earlier case, that is, whether the Muskeg M tractor is "suitable for agricultural use."

It was established in the incorporated case that the basic construction of the J-5 and Muskeg M tractor was the same. The court at pages 446-447 of the incorporated case described the two tractors as follows:

"... They are constructed with a toboggan type hull and frame body which, in the case of the Muskeg model, is said to

be watertight up to the mudguards. Both models have full-length, endless tracks on both sides of the body composed of reinforced rubber and rayon belts to which are bolted spring steel cross-links and which travel around rubber tired support wheels (Bogie wheels) and front-mounted reinforced rubber sprocket gears.

"The principal points of difference in construction between the two models appear to be size and power, with the Muskeg M model being the larger, heavier and more powerful of the two tractors. Thus, where the J–5 model is 9'4'' long, 5' wide, 5'10'' high with cab, weighs 3,400 pounds approximately, and employs three support wheels and one sprocket gear on each track, the Muskeg M model is 11'8'' long, 7'3'' wide, 5'8'' high with cab, weighs 5,885 pounds, employs four support wheels and one sprocket gear in *pairs* on each track, has a rated payload carrying capacity of 2,500 pounds, and can take a V–8 engine to deliver up to 188 horsepower in driving the tractor." (Emphasis quoted.)

In the case now before us plaintiff's witness, Joffre Champigny, sales manager for the Industrial Division of Bombadier Ltd. of Quebec, Canada, the exporter (who also testified in the incorporated case), testified that there is a difference in the price of the two tractors due to their difference in size. The J–5 is smaller than the Muskeg M so the latter takes the higher price. The J–5 has a smaller, narrower, shorter track and thus has less traction and flotation. The big advantage of both tractors according to Mr. Champigny is their flotation and traction on soft ground.

The only difference between the Muskeg tractor and carrier is in the location of the engine. The Muskeg tractor has the engine in the middle and the Muskeg carrier has the engine towards the front. Mr. Champigny stated: "But it's the same frame, the same suspension, same traction, same engine, same differential, same transmission. In fact, about 90 per cent of the parts are the same. It's just a matter of having a different location of the engine." (R. 11). In view of this testimony the court will use the term Muskeg M to embrace Muskeg tractors and carriers.

The defendant who did not present any witnesses in the incorporated case has presented seven witnesses in this case.

Its first witness, Laurence Dayton, a regional game biologist for the State of Michigan, testified that the State's Department of Natural Resources used the tractor to remove trees from the river, add sandbags to dikes and other land operations. He said he did not know of its use for agricultural purposes, but did not mean to imply that the Muskeg tractor is not used for agricultural purposes.

The second witness, Mrs. Nayrube Shaw, secretary-treasurer of an excavating company in Jackson, Michigan, said her company used the tractor for earthmoving, excavating and harvesting peat moss.

The third witness, Irving Stone of the Otsego Ski Club in Gaylord, Michigan, testified that the Muskeg tractor is "an *agricultural instru-*

# 78

*ment* that we normally used for field work, but we use it for breaking snow." (R.37). (Emphasis added.) Mr. Stone said he had seen such tractors used at two other ski areas.

Defendant's fourth witness, Wayne A. Rigg of Minneapolis, who was general superintendent of Transportation, Northern States Power Co., testified that his company used the tractors for setting or handling poles and in brush spraying. He said he had not observed any farm use of Muskegs as he was "not exposed to that area" (R. 63), and didn't mean to imply that it isn't used on a farm. (R. 65–66).

Defendant's fifth witness, Ray Roberts of Madison, South Dakota, assistant superintendent for an electric power company, introduced into evidence a picture, exhibit 0, showing a Muskeg tractor being used to carry people over places where a wheeled vehicle would not work. He also stated that he did not mean to imply that the Muskeg tractor is not used on a farm. (R. 71).

Defendant's sixth witness, Jack Brazeau of Greenway, Wisconsin, an equipment superintendent who uses Muskegs in building power lines, testified they cost $4,850. He would not say that the Muskeg is not used in any type of farming operations (R. 80), and that Muskegs could be used for cleaning brush to get ready to farm and to crop the land. (R. 84).

Defendant's seventh and last witness, Ivan W. Holden of Grand Rapids, Minnesota, a forester for the Department of Conservation of the State, testified that he used the Muskeg tractors to suppress fires, in the marsh, bogs and swamps.

Defendant's seven witnesses testified that Muskeg tractors could be used by conservationists, excavators, construction companies, power companies and ski clubs. This evidence is cumulative to the use of the Muskeg tractors for logging testified to in the incorporated case. It does not disprove or refute the evidence in the incorporated case, and that offered by plaintiff's two rebuttal witnesses in this case, that the Muskeg tractor is suitable for agricultural usage. In fact defendant's first, fourth and fifth witnesses stated they did not intend to imply that Muskegs were not used on a farm. Its third witness who was from a ski club described the Muskeg they used for packing snow as "an agricultural instrument." Its sixth witness testified that when the Muskeg is used for cleaning brush to get ready to farm and to crop the land, it is a farming operation.

We stated in the incorporated case: "The unrefuted evidence that the involved tractors are used on farms for spreading manure and lime and other fertilizer, used in sugar bushes for gathering maple sap, used for plowing, used to pull hay balers, used for seeding, used to pull harvesters in harvesting corn, and used in disk harrowing

is sufficient to show that said tractors are actually, practically, and commercially fit for agricultural purposes."

According to the "Explanatory Notes" to the Tariff Classification Study dated November 15, 1960, at pp. 325–326 : "... Tractors are mobile power units used for many purposes, including agricultural, construction, road building, etc. Attempts to distinguish so-called agricultural-type tractors from types chiefly used for non-agricultural purposes necessarily involve unrealistic distinctions. ... Item 692.30 would change the present 'chief use' concept ... by providing for tractors 'suitable for agricultural use.' "

The parties have stipulated that the J–5 tractor is suitable for agricultural usage. The difference between the J–5 and Muskeg tractor is in degree and not in kind. Plaintiff has met the suitability for agricultural usage test. It, therefore, follows that the protests must be sustained.

Judgment will be entered accordingly.